KAREN INFANTE ALLEN
TRUMBULL CO CLERK OF COURTS
2022 CV 00952
FILED: 07/12/2022 03:10 PM

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| KEITH SIEFERT<br>9323 Sunview Drive, N.E.<br>Warren, OH 44484 | )<br>)<br>) | CASE NO. |
| | ) | JUDGE |
| Plaintiff, | )<br>)<br>) | |
| vs. | )<br>) | **COMPLAINT** |
| LIBERTY TOWNSHIP<br>1315 Churchill-Hubbard Road<br>Youngstown, OH 44505 | )<br>)<br>)<br>) | **(Jury Demand Endorsed Hereon)** |
| | )<br>)<br>) | |
| Defendant. | ) | |

Now comes Plaintiff, Keith Siefert (hereinafter "Plaintiff"), by and through his undersigned counsel, Dworken & Bernstein Co., L.P.A. and for his complaint against Defendant, Liberty Township (hereinafter "Defendant"), states as follows:

### INTRODUCTION

1. Plaintiff brings this lawsuit against Defendant as a result of Defendant's violations of the Family and Medical Leave Act, 29 USC §2601, et seq. (hereinafter "FMLA").

### JURISDICTION AND VENUE

2. Plaintiff realleges and affirms every allegation contained in paragraph 1 of this complaint as if fully rewritten herein.

**EXHIBIT A**

3. This Court has jurisdiction over this action pursuant to the FMLA.

4. This Court has personal jurisdiction over Defendant.

5. This action is properly venued.

## PARTIES

6. At all times relevant herein, Plaintiff was a citizen of the United States and a resident of Trumbull County, Ohio.

7. At all times relevant herein, Plaintiff was an employee as defined 29 USC §2601, et seq.

8. At all times relevant herein, Defendant an employer within the meaning of 29 USC §2601, et seq.

9. Defendant was Plaintiff's employer for purposes of the FMLA.

## FACTUAL ALLEGATIONS

10. Plaintiff realleges and affirms every allegation contained in paragraphs 1 through 9 of this complaint as if fully rewritten herein.

11. Plaintiff began working for Defendant in 2009 as the maintenance supervisor.

12. As maintenance supervisor, Plaintiff was solely responsible for the service and maintenance of all Township vehicles, as well as maintenance of all Township buildings.

13. Plaintiff was hired by Pat Ungaro, then Township administrator and the Township's trustee.

14. Under the direction of Ungaro, Plaintiff had no performance or disciplinary issues.

15. While employed as the maintenance supervisor, Plaintiff received several letters of commendation from city officials.

16. Although Plaintiff was an hourly employee, Plaintiff was not required to clock in and clock out.

17. Plaintiff regularly reported to work on or before seven a.m. and usually ended his day around three p.m.

18. Only if Plaintiff worked significantly after three p.m. would he submit a request for overtime compensation.

19. Plaintiff was given a thirty-minute paid lunch break.

20. The time of Plaintiff's lunch break varied from day-to- day depending on his work activities.

21. Plaintiff was regularly paid for a forty-hour work week.

22. At no time during Plaintiff's employment with Defendant was he ever made aware of any policy regarding internet usage.

23. Plaintiff often used his work computer during his lunch for personal business.

24. Plaintiff also used his work computer for Township business including researching work-related projects and searching for parts.

25. At no point during Plaintiff's employment with Defendant was he ever disciplined for excessive internet usage.

26. At no point during Plaintiff's employment with Defendant was Plaintiff ever disciplined for failure to timely complete work assignments.

27. In approximately 2014, Plaintiff suffered a mental breakdown and was diagnosed with an Anxiety Disorder.

28. As a result, Plaintiff was off work for approximately two and a half months.

29. At the time of his leave of absence, Plaintiff experienced confusion, disorientation, and was unable to process information.

30. Plaintiff's medical condition was managed with rest and medication and he was ultimately able to return to work.

31. Even after Plaintiff was released to return to work, he continued to take Lexapro for his condition.

32. During his leave of absence, Plaintiff provided notes from his doctor to the Township regarding his leave of absence.

33. Upon information and belief, members of the Township, including Martha Weirick were aware that Plaintiff was off of work due to mental health reasons.

34. At no time during his absence in 2014 or at any point after his doctor released him to return to work did Plaintiff threaten any employee or act in any way that would cause Defendant to believe he was a danger to himself or others.

35. In October of 2016, Chief August Birch sent a letter Pat Ungaro, Jody Stoyak, Jason Rubin, and Dan Nudell expressing concern that Plaintiff was being assigned too much work.

36. At some point after Chief Birch's letter, Plaintiff stopped performing larger maintenance projects for the Township road department and the Township fire department.

37. Plaintiff was in no way disciplined as a result of Chief Birch's letter.

38. In addition to the service and maintenance of all Township vehicles and the maintenance of all Township buildings, Township employees including Officer Pete DeAngelo,

Joel Davis, Chief Toby Molero and Martha Weirick often asked Plaintiff to perform maintenance on their personal vehicles after work hours.

39. On or about July 1, 2020, Captain Ray Buhala assigned Plaintiff the task of installing the Watch Guard computer system on four Township police cruisers.

40. Although Plaintiff had installed similar equipment in the past, he was not familiar with this specific equipment.

41. Captain Buhala informed Plaintiff that the installations would need to be complete by July 14, 2020 as a representative from Watch Guard was flying in to install the necessary software to complete the installation process.

42. During the first two weeks of July, Plaintiff did his best to prioritize all of the assignments that were given to him including the installation of the Watch Guard hardware.

43. As of the end of the day on Monday, July 13, 2020, Plaintiff had completed the installation of the Watch Guard hardware on three of the four required vehicles.

44. Although he did not realize it at the time, Plaintiff was having an increasingly difficult time concentrating on his work and completing this assignment.

45. On the evening of July 13, 2020, Plaintiff's wife, Tami Seifert, observed Plaintiff engaging in some unusual behavior.

46. As an example, Mrs. Seifert noticed that Plaintiff was not responding to her when she was talking to him and he spent a lot of time looking at his phone.

47. On the evening of July 13, 2020, Plaintiff also insisted on going for a bike ride even though it was dark outside.

48. Mrs. Seifert, aware of the mental breakdown that Plaintiff had in 2014, was concerned about the behavior she had observed.

49. On July 14, 2020, Mrs. Seifert became concerned when Plaintiff stopped responding to her text messages.

50. Mrs. Seifert contacted Captain Phil Lucarell, a Township firefighter and asked him to look in on Plaintiff who always worked alone.

51. As Captain Lucarell was not at work that day, he asked Township employee, Ron Simone to check on Plaintiff.

52. Captain Lucarell later advised Mrs. Seifert that Ron Simone had checked on Plaintiff who seemed "sad but okay."

53. On July 14, 2020, Plaintiff, whose shift typically ended around three p.m., still had not arrived home at four p.m.

54. Mrs. Seifert became concerned and immediately drove to the Township.

55. When Mrs. Siefert arrived, she could see that Plaintiff was not himself.

56. As an example, Plaintiff was working on one of the police cruisers even though his shift had ended over an hour prior.

57. Mrs. Siefert observed the cruiser's radio playing loudly while all of the lights were on, including the sirens and the doors to the cruiser were open.

58. Mrs. Seifert repeatedly attempted to get Plaintiff into her car; however, he repeatedly told her that he needed to finish installing the antenna.

59. Although Plaintiff ultimately got into Ms. Seifert's car, he subsequently exited the vehicle while it was moving.

60. Mrs. Seifert then went to the administration office to get help.

61. Subsequently, several officers, including Chief Molero and Captain Buhala came over to the area where Plaintiff was located.

62. At no time did Plaintiff become hostile or combative; however, he was confused and disoriented.

63. Captain Buhala informed Mrs. Seifert that he had called an ambulance.

64. Plaintiff was subsequently taken by ambulance to St. Elizabeth Medical Center where he was admitted to the psychiatric ward and diagnosed with Acute Psychosis and Delirium.

65. Only after he was admitted to the hospital did Defendant discover that Plaintiff had unintentionally installed the Watch Guard hardware on the wrong police cruiser.

66. When Mrs. Seifert learned of Plaintiff's error, she offered her personal car insurance to take care of any damage to the cruiser.

67. Captain Buhala declined her offer of insurance, informed her that the cruiser had already been fixed and told her that police officers had done worse damage in the past.

68. After Mrs. Seifert returned home from the hospital on the evening of July 14, 2020, she learned that Captain Buhala had come to her house and left a message asking her to call.

69. Mrs. Seifert called Captain Buhala on the evening of July 14, 2020 and he asked her if he could buy back the gun he had sold to Plaintiff on the afternoon of July 13, 2020.

70. Mrs. Seifert informed Captain Buhala that she would have to obtain the gun from the safe and would return same to him.

71. At no time during this conversation, did Captain Buhala express any concern that Plaintiff was dangerous nor did he express any statements that the Plaintiff had violated any of Defendant's policies.

72. On the morning of July 16, 2020, Mrs. Seifert received a call from Chief Molero asking her if she wanted to meet for a cup of coffee.

73. Chief Molero then indicated he was on his way to the hospital but would call her after.

74. At approximately 12:45 p.m. on July 16, 2020, Chief Molero entered the psychiatric ward of St. Elizabeth Medical Center and hand delivered a notice of termination to Plaintiff.

75. The written notice provided no reason for the termination nor did Chief Molero inform Plaintiff why he was being terminated.

76. Minutes later, Mrs. Seifert received a phone call from Plaintiff informing her that Plaintiff had been terminated.

77. Mrs. Seifert immediately contacted Chief Molero to find out why Plaintiff had been terminated.

78. Chief Molero responded that he really did not know why Plaintiff was being terminated he was just delivering the message of the Trustees.

79. The only explanation that Chief Molero gave Mrs. Seifert was that the Trustees thought Plaintiff was unsafe.

80. Mrs. Siefert also spoke to Township administrator, Martha Weirick, who confirmed the same sentiment that the Trustees felt Plaintiff was unsafe.

81. On approximately July 29, 2020, Plaintiff's physician, Dr. Arthur Duran, released him to return to work.

82. It was not until Plaintiff filed for unemployment benefits that he learned that Defendant was claiming that he had been terminated for just cause.

83. Specifically, Defendant was claiming that Plaintiff had intentionally damaged a Township vehicle, had failed to timely complete work assignments and had excessively used the internet during work hours.

84. Plaintiff's conditions of Acute Psychosis and Delirium constitute serious health conditions under the FMLA.

85. Defendant was required to offer Plaintiff leave under the FMLA.

86. Defendant terminated Plaintiff rather than offering him FMLA for his serious health condition thereby interfering with his rights under the FMLA.

87. As a direct and proximate result of Plaintiff's termination, he has suffered lost wages, lost benefits, emotional distress, attorney fees and other damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00).

## COUNT ONE
## (FMLA)

88. Plaintiff realleges and reavers each and every allegation contained in Paragraphs 1 through 87 of this Complaint as if fully rewritten herein.

89. Plaintiff's Acute Psychosis and Delirium constitutes serious health conditions for purposes of the FMLA.

90. Plaintiff was admitted to the hospital on July 14, 2020 as a result of his serious medical condition and thus, was entitled to FMLA leave in accordance with the provisions of the FMLA.

91. The time Plaintiff took off work as a result of his serious health conditions qualified as an FMLA leave of absence in accordance with the provisions of the FMLA.

92. Defendant's termination of Plaintiff violates the FMLA and constitutes interference with Plaintiff's asserting his rights under the FMLA in violation of 29 USC §2615(a)(1).

93. As a direct and proximate result of Defendants' interference with Plaintiff's FMLA rights, Plaintiff has sustained and continues to sustain lost wages, lost benefits, and has incurred other costs and expenses, including but not limited to attorneys' fees.

WHEREFORE, for the foregoing reasons, Plaintiff requests the following relief:

A. Compensatory damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00);

B. Punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00);

C. Liquidated damages pursuant to the FMLA;

D. Attorneys' fees and costs as provided for under the law;

E. Pre- and post-judgment interest; and

F. Such other and further relief as this Honorable Court may deem Plaintiff to be entitled.

Respectfully submitted,

*/s/ Kristen M. Kraus*
Kristen M. Kraus (#0073899)
Richard N. Selby II (#0059996)
DWORKEN & BERNSTEIN CO., L.P.A.
60 South Park Place
Painesville, Ohio 44077
(440) 352-3391
kmkraus@dworkenlaw.com
rselby@dworkenlaw.com

## INSTRUCTIONS FOR SERVICE

Please serve Defendant at the address set forth in the caption of the Complaint by certified mail, return receipt requested, in accordance with the Ohio Rules of Civil Procedure.

/s/ Kristen M. Kraus
Kristen M. Kraus – 0073899 O.R.N.

## JURY DEMAND

Now comes Plaintiff, by and through his counsel, and demand that this case be tried before a jury of the maximum number allowed by law.

/s/ Kristen M. Kraus
Kristen M. Kraus – 0073899 O.R.N.